

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00973-CV

**IN THE INTEREST OF A.M.S.**, K.R.S., R.R.S., A.S.,
R.I.S., E.R.S., J.A.S., and N.M.S., Children

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2017PA01328
Honorable Renée Yanta, Judge Presiding[1]

Opinion by:  Beth Watkins, Justice

Sitting:  Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Beth Watkins, Justice

Delivered and Filed: May 22, 2019

AFFIRMED

Appellant father ("Father") appeals from the trial court's order terminating his parental

rights.  On appeal, Father contends the evidence is legally and factually insufficient to support the

trial court's finding that termination is in the children's best interests.  We affirm.

## BACKGROUND

The Texas Department of Family and Protective Services ("the Department") became

involved with the family in 2011 based on allegations of drug use by both parents.  There was

repeat involvement in 2014 — based on alleged drug use by Father — and 2016 — based on

---

[1] The Honorable Cynthia Marie Chapa is the presiding judge of the 288th District Court, Bexar County, Texas.  The termination order was signed by the Honorable Renée Yanta, who was the presiding judge of the 150th District Court, Bexar County, Texas, at the time the order was signed.

alleged domestic violence by Father and claims of attempted sexual assault. With regard to all three interactions, the Department instituted Family Based Services. In 2017, one of the children, thirteen-year-old K.R.S., called 911 from a neighbor's home, asserting Father was abusing Mother. This time, the Department removed the children — eight in all — who ranged in age from infant to teenager. The Department instituted a legal case, filing a petition seeking termination in the event reunification could not be attained. The Department prepared service plans for both parents.

Ultimately, the Department moved to terminate Father's and Mother's parental rights on numerous grounds. At the September 2018 final hearing, the trial court received three days of testimony before terminating Father's parental rights on multiple grounds and finding termination to be in the children's best interests.[2] *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (F), (O), 161.001(b)(2). Father appealed.

## ANALYSIS

Father does not challenge the grounds upon which his parental rights were terminated. Instead, he only challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

### *Standard of Review*

Clear and convincing evidence must support a trial court's findings under section 161.001(b)(2) of the Texas Family Code ("the Code"). *See id.* § 161.001(b). "Clear and convincing evidence" is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. Courts require this heightened standard because termination of parental rights implicates due process. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2015). When reviewing the legal and factual sufficiency of the

---

[2] The trial court did not terminate Mother's parental rights, but appointed her possessory conservator. Mother did not appeal the trial court's order.

evidence, we apply well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency). These standards require that we determine whether the evidence is such that the trier of fact could reasonably form a firm belief or conviction that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In conducting a sufficiency review, we may not weigh a witness's credibility because it depends on appearance and demeanor, and these are within the domain of the trier of fact. *In re J.P.B.*, 180 S.W.3d at 573. Even when such issues are found in the appellate record, we must defer to the fact finder's reasonable resolutions. *Id.*

### *Best Interests*

#### *Applicable Law*

In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). Therefore, we also consider the best interest factors set forth in section 263.307(b) of the Code. *Id.* § 263.307(b).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, a trier of fact may measure a parent's future conduct by his past conduct in determining whether termination is in the child's best interest. *Id.* Evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2012). Moreover, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the best interest of the

child, not the best interest of the parent. *In re D.M.*, 452 S.W.3d 462, 468–69 (Tex. App.—San Antonio 2014, no pet.).

*Application*

The Department removed the children after K.R.S. called police to report Father was abusing Mother. *See* TEX. FAM. CODE §§ 263.307(b)(7) (whether there is history of abusive or assaultive conduct by child's family or others with access to home), 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d 371–72. The Department's investigator, Maria Resendez, testified the home was dirty and there were clothes everywhere. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. Ms. Resendez stated there was no food in the home and insufficient formula for infant N.M.S. even though the parents received approximately $1,300.00 in food stamps each month. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. When asked why there was no food in the home, Mother advised they had mismanaged their food stamps. Additionally, Mother and all of the children had lice. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d 371–72.

This was not the first time the family fell under the Department's purview. *See In re E.D.*, 419 S.W.3d at 620 (holding that trier of fact may measure parent's future conduct by past conduct in determining whether termination is in child's best interest). In 2011, the Department received a report that both parents were using drugs, and both tested positive for marijuana. *See* TEX. FAM. CODE §§ 263.307(b)(8) (whether there is history of substance abuse by child's family or others with access to child's home), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. During its investigation, the Department discovered there was no electricity or running water in the home, and that the children had been left alone. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. Mother denied the children were left alone, testifying their paternal grandmother was present.

Three years later, after the Department received a report that Father was using drugs, Father tested positive for marijuana. *See* TEX. FAM. CODE § 263.307(b)(8); *Holley*, 544 S.W.2d 371–72. In 2016, Father was arrested for assault—family violence. *See Holley*, 544 S.W.2d 371–72; *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (recognizing parent's criminal history is factor that may be considered in determining child's best interest). Father described the incident as "a little argument" during which he "moved [Mother] out of the way" so he could leave. Father bonded out of jail but failed to appear for his scheduled hearing. Father testified he did not appear because he believed paying the bond resolved the matter. A warrant was issued for his arrest. Ultimately, Father was diverted to drug court where he "pled to the case" and received twelve months probation, which he was still serving at the time of the final hearing. *See Holley*, 544 S.W.2d 371–72; *In re C.T.E.*, 95 S.W.3d at 466. In 2016, there was also an allegation Father attempted to sexually assault his fifteen-year-old sister-in-law. The Department was called and ultimately found "reason to believe" the allegation was true. *See Holley*, 544 S.W.2d 371–72; *In re C.T.E.*, 95 S.W.3d at 466. Based on the sister-in-law's allegation, Father was "kicked out of drug court."

In each of these instances, the Department instituted services to keep the family together. As part of these Family Based Services, both parents were asked to complete parenting and domestic violence classes, engage in counseling, and address their drug use. Department case worker Minnie Ayala, who worked with the family during the 2016 Family Based Services, testified the parents never engaged in services even though she provided them with information regarding providers multiple times and offered transportation. *See* TEX. FAM. CODE § 263.307(b)(10) (willingness and ability of child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate Department's supervision); *Holley*, 544 S.W.2d 371–72. During the 2016 Family Based Services, the Department instituted a safety plan

that required Father to be supervised by the maternal grandmother if the children were present. According to Ms. Ayala, Father breached the safety plan — she saw him at the home when the maternal grandmother was absent. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Father admitted he violated the safety plan, but stated it was unintended — he believed his mother was present in the home. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. The family continued in Family Based Services until June 2017.

In June 2017, the Department removed the children from the home and instituted a legal case, ending Family Based Services. The Department made this decision after K.R.S. made a 911 call from neighbor's house, telling authorities Father was abusing Mother. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. Mildred Hohensee, the Department case worker beginning in December 2017, testified K.R.S. said she refused to watch Father "hurt her mother" and jumped into the fray. According to Ms. Hohensee, K.R.S. reported that Father kicked her out of the house and "threatened to call the cartel on her," which Father denied. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. K.R.S. went next door and called police. Both Father and Mother denied the allegations of domestic violence at the final hearing. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. However, Mother's counselor, Patricia Boone, testified Mother told her that when Father drank alcohol or used drugs, he became aggressive. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. In their initial sessions, Mother admitted the abuse was physical, stating Father attempted to choke her. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. Later, Mother backtracked, claiming the abuse was more verbal than physical. Ms. Boone opined that Father's failure to address his domestic violence issues would be dangerous for Mother and the children. *See Holley*, 544 S.W.2d 371–72. She further stated domestic violence does not resolve itself without

treatment, but will escalate. Moreover, it teaches the children that such behavior is a normal part of a relationship, which they may incorporate into their own relationships. *See id.*

Both parents testified the 2017 incident was merely a verbal altercation. Although Father denied ever physically harming Mother, he admitted the children believe he physically abused Mother and they fear for her safety. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. Ms. Hohensee testified the children have grown up in an environment involving domestic abuse. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72. The older children have told her they will no longer sit by and watch Father hit or choke Mother; rather, they will step in and stop the abuse. Nine-year-old A.S. told her he worried Father might kill Mother. *See* TEX. FAM. CODE §§ 263.307(b)(7), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72.

Father always denied he physically abused Mother, stating he "put [his] hands around her on her shoulders," and this is what the children witnessed. He testified he was grateful his daughter called 911 because without that call, he would not have taken classes showing him how to react more appropriately.

In addition to domestic violence, the evidence showed drug use by the parents, particularly Father. *See In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting parent's drug use supports finding that termination is in best interest of child). As noted above, the Department presented evidence of his drug use from 2011 and 2014. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72; *In re L.G.R.*, 498 S.W.3d at 204. During the legal case, Father was required to submit to random drug tests, and according to Ms. Hohensee, he tested positive for drugs on several occasions. *See In re L.G.R.*, 498 S.W.3d at 204. His positive drug tests resulted in his exclusion from approximately six visits with his children. Three months before the final hearing, Father tested positive for amphetamines,

methamphetamines, cocaine, and marijuana. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72; *In re L.G.R.*, 498 S.W.3d at 204. Father contested the results. In August 2018, Father took two drug tests. The first test resulted in a "positive diluted" result, which Ms. Hohensee testified meant there was some chemical in the urine that diluted the test. The second test showed a "negative diluted," meaning Father had used water or some other substance to flush his system. Ms. Hohensee's testimony suggested Father was attempting to thwart the urine tests. There was also testimony that Father was attempting to avoid hair follicle tests by shaving his head.

Ms. Hohensee scheduled a hair follicle test for Father in September 2018, approximately two weeks before the final hearing. On September 6, 2018, she texted Father, in pertinent part: "Please be advised to go take a drug test before 5:00 p.m. on September 7th at Genesis Drug Testing." Father did not take the drug test, which Ms. Hohensee testified counts as a positive result. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Father explained he believed the text required him to go on Friday, September 7th, but he was working from 4:30 a.m. until 8:30 p.m. that day. Ms. Hohensee stated she knew Father worked on Fridays, and questioned Father's interpretation, stating the text meant he could have gone on Thursday the 6th. Ms. Hohensee did not believe Father misunderstood her text because she had been sending Father similar texts throughout the case that he seemingly understood. Ms. Hohensee testified Father did not attempt to contact her to clarify the meaning of the text or to reschedule; rather, he simply failed to appear. *See* TEX. FAM. CODE §§ 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Father testified he attempted to follow up with Ms. Hohensee, but she did not respond. *See Holley*, 544 S.W.2d 371–72.

Father admitted he had used drugs since the age of fourteen, but struggled only with his use of marijuana. He testified he only used cocaine and methamphetamines a couple of times.

Father testified it took him a while to take his drug treatment seriously, admitting he continued to use drugs from June 2017 to April 2018. *See* TEX. FAM. CODE § 263.307(b)(11) (willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time); *In re S.R.*, 452 S.W.3d 351, 367 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (holding that factfinder may conclude parent's changes shortly before trial are too late to have impact on best-interest determination). Father first testified that after April 2018, he did not use drugs. However, when cross-examined by the ad litem for the children, he stated he continued to use drugs through the end of May 2018, almost a year after the children were removed. *See* TEX. FAM. CODE § 263.307(b)(11); *In re S.R.*, 452 S.W.3d 351 at 367. He believed his positive hair follicle results after April 2018 were the result of his drug use in the preceding months.

Father was supposed to develop a written relapse plan with regard to his drug use. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Ms. Boone testified there is a relapse rate of about eighty-seven percent in the first year for drug and alcohol addiction. Father testified he provided Ms. Hohensee with a relapse plan, and a handwritten plan dated June 2018 was admitted into evidence. However, Ms. Hohensee denied receiving the plan or discussing it with Father as mandated.

In addition to issues involving domestic violence and drug use, the record shows Father was unable to secure stable housing — an issue that predated the children's removal. *See* TEX. FAM. CODE § 263.307(b)(12); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting parent's inability to provide stable home supports finding that termination is in child's best interest). Father testified that in 2011, the family lived in a three-and-a-half bedroom home. They had been living there for three or four years, but sometime in 2012, were forced to move. At that point the family moved to Hondo, Texas where they lived in a large home with Father's uncle for approximately a year. The family moved back to San Antonio, living with Father's mother-in-

law for approximately a month before they returned to the three-and-a-half bedroom home they originally rented. This is the home in which the family resided in 2017.

After the removal, Mother and Father were evicted from that home. They moved in with a sister-in-law for approximately nine months. At the time of the final hearing, Father and Mother had been living with Mother's uncle for approximately three months. Mother admitted this was not a stable living arrangement. Ms. Hohensee testified that although she asked ten or twelve times during the course of her involvement in the case, the parents never advised her of their living arrangements. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Mother admitted that she declined to advise Ms. Hohensee about their housing arrangements, but Father testified he told Ms. Hohensee where they lived. Ida Lopez, the parent educator assigned to Mother and Father, testified she asked the parents on several occasions about their living arrangements, but they refused to disclose where they were living. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Ms. Lopez stated that although she was comfortable with their parenting skills by the conclusion of their program, the lack of housing stability was a continuing concern. Although she suggested housing options, it concerned her that the parents had done little to secure housing. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72.

According to Ms. Hohensee, Department protocol required that she meet with the parents once a month in their home, but each time the parents stated they were living with family that did not want to be involved with the Department. Ms. Hohensee testified the absence of a home during the course of the case prevented her from determining whether the parents would have a proper home for raising children. *See* TEX. FAM. CODE § 263.307(b)(12); *In re M.R.*, 243 S.W.3d at 821.

Ms. Hohensee testified stable housing was discussed at every hearing and the parents understood stable housing was a requirement. Yet, after approximately fifteen months, they had not obtained housing. *See* TEX. FAM. CODE § 263.307(b)(10); *Holley*, 544 S.W.2d 371–72. Ms.

Hohensee testified she tried to give the parents some leeway with regard to housing, stating she told them a two-bedroom home would satisfy the Department. She even told the parents to start with a one-bedroom home to show ninety days of stability. Once the children were returned, they could attempt to secure a larger place. Ms. Hohensee stated she was trying to make it easy for the parents to achieve the housing goal set out in the service plans. The evidence showed that neither parent attempted to secure housing until just before the final hearing. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(11), 263.307(b)(12); *In re S.R.*, 452 S.W.3d at 367. Mother testified they began looking for apartments around the end of July 2018, more than a year after the children were removed. *See* TEX. FAM. CODE §§ 263.307(b)(11), 263.307(b)(12); *In re S.R.*, 452 S.W.3d at 367. Around that same time, the parents sought out housing services. Father testified he waited a year to look into housing resources due to his pride, believing he could find housing on his own. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11). Father and Mother testified they were unable to secure housing because they lacked written proof of stable employment, and Father's criminal record. *See Holley*, 544 S.W.2d 371–72.

Father admitted that part of the reason they could not find housing was due to his inability to obtain stable employment. *See In re S.R.*, 542 S.W.3d at 367 (considering parent's inability to maintain stable employment in determining whether termination is in child's best interest). When asked why he was unable to find stable employment during the previous year, Father testified that attending service-plan classes precluded it. *See Holley*, 544 S.W.2d 371–72. He testified he previously had steady jobs, but was fired from "two or three of the jobs" because he had to miss two or three times a week to attend classes. *Id.* Father stated he had been working for two different plumbing companies for the past fourteen or fifteen years — companies owned by his uncles — but was fired in December 2017 for missing work because he had to attend service-plan classes. *Id.* Father testified he knew service-plan classes could be scheduled around work, but because he

had to be available for emergency plumbing calls he was still fired. Father believed his difficulty finding work was also due to his criminal history, which Father said included the allegations of sexual assault involving his sister-in-law, driving without a license, theft, and domestic violence. *See In re C.T.E.*, 95 S.W.3d at 466 (recognizing parent's criminal history, though not dispositive, is factor to be considered in determining whether termination is in child's best interest).

Father said that when he worked for the plumbing companies he earned $500.00 to $600.00 per week. When asked why he was unable to save enough money to secure housing given those earnings, Father stated he saved money, but could not prove his employment because he was paid in cash. He testified his uncle provided him with an employment letter, but this was unacceptable to the places where he sought housing. *See Holley*, 544 S.W.2d 371–72.

As for his current employment, Father testified he works two to three times a week through a temporary agency and works for a cousin at a U-Haul–related company. Father's initial testimony suggested he earned sufficient funds to secure housing. However, this testimony conflicted with other evidence admitted at trial, and Father subsequently backtracked regarding his earnings. Ms. Hohensee testified demonstration of stable employment was a service plan requirement, which Father did not provide. *See In re S.R.*, 452 S.W.3d at 367.

A parent's non-compliance with the court-ordered service plan is probative with regard to a best interest determination. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d 681, 687 (Tex. App.—San Antonio 2013, no pet.). Father stated he reviewed and signed the service plan in July 2017. He said he understood that if he did not complete the services, his parental rights could be terminated. The service plan required that he:

> (1) complete a drug/alcohol assessment and follow through with any recommendations, including inpatient/outpatient treatment and counseling;
>
> (2) complete a drug treatment program;

(3) maintain a drug-free lifestyle and submit to random drug testing;

(4) create a written relapse plan and discuss it with the case worker;

(5) complete an eight-week parenting class and provide a certificate of completion to the case worker;

(6) contact a therapist and set up counseling appointments, actively engage in counseling, and follow all of the therapist's recommendations;

(7) complete a psychosocial evaluation;

(8) complete family violence perpetrator classes through Family Violence Prevention Services ("FVP");

(9) demonstrate the ability to earn a stable income and provide stable housing; and

(10) refrain from engaging in illegal activities.

Father testified he "mostly" completed all of his services. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687. Father said the only service he failed to complete was the twenty-week FVP domestic violence class. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687. Father stated he began the FVP course, but was "kicked out" because Mother had surgery and he missed "a couple of days." *See Holley*, 544 S.W.2d 371–72. Father said he discussed the issue with Ms. Hohensee and she told him he could choose a different domestic violence class. *See Holley*, 544 S.W.2d 371–72. He testified that after he selected and graduated from the four-week course, which focused on parent education, healing domestic violence, and charter development, "it wasn't to [Ms. Hohensee's] liking[,]" and she sent back him to the twenty-week FVP class. *See Holley*, 544 S.W.2d 371–72. He re-engaged in that class, but had at least seven weeks remaining in the FVP domestic violence class at the time of the final hearing. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687.

Ms. Hohensee disputed Father's account. When he was discharged from the FVP program, she instructed him to re-engage in the program. She denied telling him he could choose a domestic violence class or attend any other program except FVP. Ms. Hohensee explained the FVP program was required because it is the most intense perpetrator program available. She testified the four-week class he took is a global class, teaching men about being good fathers. Although the program included one lesson on domestic violence, it was inadequate for Father, who had domestic violence issues dating back several years. In fact, the director told Ms. Hohensee the program did not cover many of the issues Father needed to address. Ms. Hohensee testified she sat down with Father and showed him that the service plan required the FVP program and that it was important. Father was reluctant, telling her he did not want to go to twenty sessions and pointing to his completion of the four-week program. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11). Father finally agreed to return to the FVP program in July 2018, two months before the final hearing. Ms. Hohensee stated Father's failure to complete the program was problematic given that domestic violence was probably the top issue he needed to address. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687.

Father admitted he did not complete the required psychosocial evaluation. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687. He stated Ms. Hohensee never provided the paperwork. *See Holley*, 544 S.W.2d 371–72. Moreover, Father was discharged from individual counseling, which he said began in February 2018. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687. Father testified he stopped going because he "couldn't make the hours two times a week" and it did not work with his schedule. *See Holley*, 544 S.W.2d 371–72. He said he discussed the issue with Ms. Hohensee and she agreed to allow him to complete his individual counseling with his drug recovery coach in tandem with his drug treatment program at Lifetime Recovery. *See Holley*, 544 S.W.2d 371–

72. Ms. Hohensee denied this. She testified Father was supposed to go Family Service Association and engage in counseling with "Scott Rogmann [sic]." Father was discharged in December 2017 for non-attendance. Ms. Hohensee provided Father with a second counseling referral in March 2018, but Father never went. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11); *In re O.N.H.*, 401 S.W.3d at 687. Father testified that although he believed counseling was important, he did not believe it would benefit him to talk to a stranger about his problems unless that person had been through the same things he had. He stated that a Ph.D. or other degree "doesn't mean that you understand where the people are coming from."

The service plan required Father to remain drug-free and demonstrate his ability obtain stable employment and provide stable housing. Ms. Hohensee testified that from December 2017 to April 2018, Father continually tested positive for drugs. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(11). According to Ms. Hohensee, Father told her he continued to use drugs because she "frustrated him" and he decided he would just "go ahead and smoke." *See Holley*, 544 S.W.2d 371–72. She encouraged Father to enter inpatient treatment, but he refused. Finally, she sent him to Lifetime Recovery, but he was twice discharged for inconsistent attendance. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11). He ultimately completed the program on June 21, 2018. *See* TEX. FAM. CODE §§ 263.307(b)(10), 263.307(b)(11). However, he tested positive or missed drug tests throughout the course of the case. The day after he received his certificate from Lifetime Recovery, Father tested positive for amphetamines, methamphetamines, cocaine, and marijuana. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(11), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72; *In re O.N.H.*, 401 S.W.3d at 687. In addition, Father was not able to demonstrate his ability to provide stable housing or financial support for his family. *See* TEX. FAM. CODE §§ 263.307(b)(8), 263.307(b)(11), 263.307(b)(12); *Holley*, 544 S.W.2d 371–72; *In re O.N.H.*, 401

S.W.3d at 687.  The evidence shows Father did not comply with several provisions of his service plan.

The trial court found Father was subject to termination because he: (1) knowingly placed or knowingly allowed the children to remain in conditions or surrounding that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who in engaged in conduct that endangered their physical or emotional well-being; (3) failed to support the children in accordance with his ability during a period of one year, ending within six months of the date of the filing of the petition; and (4) failed to comply with his court-ordered service plan that established the actions necessary for him to obtain the return of his children.  *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (F), (O).  Father did not challenge these findings on appeal.  Although evidence that proves one or more statutory grounds for termination does not relieve the State of its burden to prove best interest, such evidence may be probative of a child's best interest.  *In re C.H.*, 89 S.W.3d at 28.

Finally, as for the stability of the proposed placements and children's desires regarding conservatorship, the trial court heard testimony from Ms. Resendez, Ms. Hohensee, and T.R., the foster mother of four of the children.  *See Holley*, 544 S.W.2d 371–72.  All eight children are in foster-to-adopt homes.  *See id.*  Four of the children — two boys and two girls, ages nine, five, two, and eighteen months — reside together in one home.  *See* TEX. FAM. CODE § 263.307(b)(1) (child's age and physical and mental vulnerabilities).  The other four children — two girls, fourteen-year-old A.M.S. and thirteen-year-old K.R.S. — and two boys — twelve-year-old R.R.S., and six-year-old R.I.S — live with T.R.  *See id.*  T.R. testified the girls have been with her almost a year and the boys were placed with her a little over three months before the final hearing.  T.R. stated it was "rocky" at first, but since they have gotten to know each other, it has been wonderful. The children are calmer and more loving.  The girls are now straight-A students.  T.R. testified her

11-year-old biological daughter and K.R.S. and are inseparable. The boys also love her biological daughter. Ms. Hohensee testified she has observed the children in their respective homes and things are going well; the children are bonded with their foster families. *See Holley*, 544 S.W.2d 371–72. All of the children are in counseling and have come far with regard to behavior. *See* TEX. FAM. CODE § 263.307(b)(1). The girls in T.R.'s home have evolved from being authority-resistant to obedient. R.R.S. no longer suffers from asthma. *See id.* Ms. Hohensee testified the two foster-to-adopt families know each other and the children visit with each other at least twice a month, a practice they are willing to continue if there is an adoption. *See Holley*, 544 S.W.2d 371–72.

The record shows the children love Father and Mother. Visitation generally went well, but Father missed several sessions due to positive drug tests. Despite the love for their parents, the children have expressed frustration regarding their parents' inability to change or to change within a reasonable time. *See id.* The two oldest girls told Ms. Resendez they were tired of their parents fighting and knew they would never change. *See id.* Ms. Hohensee testified several children told her they did not believe their parents would change. T.R. testified the children do not want to return home. *See id.*

## CONCLUSION

We hold the foregoing evidence, when considered in light of the standard of review and relevant law, is sufficient to support the trial court's finding that termination of Father's parental rights is in the children's best interests. Under the clear and convincing standard, the evidence is such that the trial court could have formed a firm belief or conviction that termination is in the bests interest of the children. *See In re J.P.B.*, 180 S.W.3d at 573. Accordingly, we overrule Father's sufficiency complaint and affirm the trial court's termination order.

Beth Watkins, Justice

- 17 -